STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

09-1131

STATE OF LOUISIANA

VERSUS

TOBY JAMES FRUGE

**********
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 115665
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

**********
**ELIZABETH A. PICKETT**
**JUDGE**

**********

Court composed of Marc T. Amy, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

**CONVICTIONS AFFIRMED; SENTENCES VACATED; REMANDED WITH INSTRUCTIONS.**

**Michael Harson**
**District Attorney, 15th JDC**
**P.O. Box 3306**
**Lafayette, LA 70502-3306**
**Counsel for Plaintiff/Appellee:**
    **State of Louisiana**

**Jason W. Robideaux**
**Attorney at Law**
**1313 Lafayette St.**
**Lafayette, LA 70501**
**Counsel for Defendant/Appellant:**
    **Toby James Fruge**

**PICKETT, Judge:**

<u>FACTS:</u>

The defendant, Toby James Fruge, was charged by bill of information filed on May 29, 2007, with two counts of forcible rape, in violation of La.R.S. 14:42.1. On June 12, 2007, a written plea of not guilty was entered. Trial by jury commenced on February 10, 2009. The jury returned verdicts of guilty of forcible rape and the responsive verdict of simple rape, a violation of La.R.S. 14:43, on February 11, 2009. On February 11, 2009, the jury returned verdicts of guilty of forcible rape of R.A. which occurred on November 5, 2004, and the responsive verdict of simple rape of J. H. which occurred on November 12, 2006.

A Motion for New Trial was both filed and denied on May 21, 2009. The defendant was then sentenced to serve thirty years at hard labor, with at least two years of the sentence to be served without benefit of probation, parole, or suspension of sentence for forcible rape. For the charge of simple rape, the defendant was sentenced to serve twenty-five years at hard labor without benefit of probation, parole, or suspension of sentence. The sentences were ordered to be served concurrently. A Motion to Reconsider Sentence was filed on May 27, 2009, and was denied on June 1, 2009.

A Motion for Appeal of Conviction and Sentence was filed on June 2, 2009, and was subsequently granted. The defendant is now before this court asserting four assignments of error. Therein, the defendant contends the following: 1) the trial court erred in denying his motion for new trial; 2) the state failed to prove he committed forcible rape beyond a reasonable doubt; 3) the state failed to prove he committed

1

simple rape beyond a reasonable doubt; and 4) the trial court erred in failing to articulate any factors in formulating his sentences.

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there is one error patent regarding the sentence imposed.

For the offense of forcible rape, the trial court ordered the defendant to serve thirty years at hard labor with *at least* two years without benefits:

> MR. BABIN: If I may clarify, on the charge of forcible rape, you sentenced him to 30 years at hard labor. The statute says at least 2 years without benefit. Is that your sentence, at least 2 years without benefit?
>
> THE COURT: Yes. I don't think I have to say that because the statute says it.
>
> MR. BABIN: I just wanted to make it clear.

Louisiana Revised Statute 14:42.1 requires at least two years of the sentence to be imposed without benefit of probation, parole, or suspension of sentence. The court rendered an indeterminate sentence in not specifying the number of years to be served without benefits. Thus, the defendant's sentence for forcible rape must be vacated and the case remanded for resentencing. *See* La.Code Crim.P. art. 879, *State v. Cedars*, 02-861 (La.App. 3 Cir. 12/11/02), 832 So.2d 1191 and *State v. Burton*, 94-486 (La.App. 3 Cir. 11/9/94), 649 So.2d 694.[1]

**ASSIGNMENT OF ERROR NO. 2:**

When multiple issues are raised on appeal, and sufficiency of the evidence is one of the alleged errors, the reviewing court should first determine whether the evidence is sufficient. *State v. Hearold*, 603 So.2d 731 (La.1992). Thus, we will first

---

[1] The victims' initials are being used in accordance with La.R.S. 46:1844(W).

2

consider the defendant's second assignment of error, in which the defendant contends the state failed to prove he committed forcible rape beyond a reasonable doubt.

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

*State v. Chaisson*, 09-119, p. 10 (La.App. 3 Cir. 10/7/09), 20 So.3d 1166, 1173 (quoting *State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (citations omitted)).

The defendant was convicted of forcible rape.

La.R.S. 14:42.1 provides in pertinent part:

> A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:

> (1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

> Thus, in order to convict the defendant, the State had the burden of proving: (1) an act of vaginal or anal intercourse; (2) without the lawful consent of the victim; and (3) where the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

*State v. Schexnaider*, 03-144, p. 10 (La.App. 3 Cir. 6/4/03), 852 So.2d 450, 457.

Jeanne Istre testified that on the date in question, she had worked with R.A. at Subway. After work, the two went to Wrangler's, a bar, between 9:45 and 10:00 p.m.

on the night in question. While at Wrangler's, R.A. danced with the defendant. Istre testified that she kept her eye on R.A. the entire time they were in the bar and she never saw R.A. leave the bar with the defendant.

Eventually, Istre and R.A. left the bar, but did not invite the defendant to go along with them. About ten minutes after they left, Istre ran off the road. Istre testified that this occurred because R.A. hollered, "Somebody's following us." Istre then looked in the rearview mirror, missed a curve, and hit the ditch. The defendant subsequently drove up.

Istre testified that the defendant wanted her and R.A. to leave with him so she could avoid getting a DWI. The two voluntarily left with the defendant and he brought them to the home of Istre's ex-boyfriend. Istre testified that R.A. was not drunk or falling down at that time. However, R.A. threw up outside the home of Istre's ex-boyfriend. The defendant then offered to bring R.A. home and she accepted.

R.A. testified that she and Istre left work together and went to Wrangler's. R.A. further testified that during the evening, she had four or five mixed drinks and a few shots; thus, she was intoxicated. She testified that she danced with the defendant, both slow and fast. R.A. further testified that she never left the bar with the defendant and did not have sex with him in the parking lot.

R.A. indicated that when she and Istre left the bar, they did not invite the defendant to go with them. R.A. and Istre noticed someone was following them, and Istre said they were going to attempt to "lose him." Istre subsequently missed a curve and hit the ditch. The defendant stopped and offered to take R.A. and Istre to the

4

home of Istre's ex-boyfriend. R.A. testified that she did not think she or Istre tried to call a wrecker.

Once at the residence, R.A. threw up both outside and inside the residence. R.A. left the residence with the defendant because he said he would take her home. R.A. did not call her boyfriend to pick her up because she and her boyfriend did not have a phone or a vehicle.

R.A. testified that she must have blacked out or fallen asleep inside the defendant's vehicle. When she awoke, they were on a gravel road and the defendant was trying to start his vehicle. R.A. testified that she told the defendant that he better get the vehicle started. She said she then knew something was wrong. R.A. subsequently testified as follows:

> A. I could just feel it in just looking at him. So I got out to take off to run, and it was just a dark gravel road. It was like darkness all the way straight. There was nowhere to go.
>
> Q. When you got out of his vehicle, did you start to run?
>
> A. But there was nowhere -- I just stopped. There was nowhere to go.
>
> Q. You went back to the vehicle. Did he bring you back? How did you get back to the vehicle?
>
> A. He was right there, and he grabbed me. And, you know, I told him, "Please, no, just don't kill me out here." And that's when he put me in the driver's side of his truck.
>
> Q. What did he say when you said, "Please don't kill me"?
>
> A. I don't remember what he said, honestly, and then that's when he had me bent over in the driver's seat and had my pants down and started to rape me.

R.A. testified that the defendant pulled her pants down. Further, she was penetrated from the front and the back, once bending over the driver's seat and the other while she was laying back.

5

After the incident, the defendant took R.A. home.  She told him she would not call the police.  As the defendant was leaving, R.A. got his license plate number.  Once inside her home, R.A. woke her boyfriend, and he went to his place of employment and called 911.

R.A. was questioned about the Alleged Sexual Assault Data Form that was filled out at the hospital as follows:

Q. Number 8, it says, "Were any threats used?"  There's a box for yes and a box for no.  Could you tell me what you checked?

A. No, there was [sic] no threats used.  He didn't have any guns or anything.

Q. And so the box no was checked?

A. Yes, sir.

Q. Now, underneath the yes or no boxes, under threats used, there was, "If yes," there's a box for not.  That box is not checked, is it?

A. Yes, sir.

Q. You said there was [sic] no threats.  Then there's a box for a gun, and that's blank also; right?

A. Yes.

Q. And there's a box for choke, and that's blank; right?

A. Yes, sir.

Q. Fists, blank; right?

A. Yes, sir.

Q. Verbal threats, blank?

A. Yes, sir.

Q. Restraints, blank?

A. Yes, sir.

6

Q. Blindfold, blank?

A. Yes.

Q. And then there's the word, "Other" with a colon and a long line, I guess to write in what other type of threats; and that's left blank also?

A. Yes, sir.

Q. Okay. And the reason the box is checked no and the reason there's no threats identified is because you didn't tell the doctors or the nurses about any threats, did you?

A. No, because there was no like gun or knife threats. They never asked -- I don't remember them asking me about threats or anything like that in the first place.

Q. And, [R.A.], let's say that the doctor mistakenly forgot to ask you about all types of threats. If you were threatened, don't you think that was something you should have volunteered when they were asking you questions how it occurred?

A. I was -- I couldn't even talk to my mom, much less anybody else about anything. It's very embarrassing.

R.A. testified that she did not remember telling police that she had Istre's cell phone and the defendant took it from her.

Detective Marcus Lemaire testified that he interviewed the defendant. During that interview, the defendant stated he had been at Wrangler's on the night in question and had danced with R.A. The defendant further stated that he and R.A. had vaginal and oral sex in the parking lot of the bar. The defendant and R.A. left the bar separately. The defendant further stated that R.A. and her friend indicated they were going to Taco Bell, so he chose to follow them. On the way there, R.A. and her friend were involved in an accident, and he stopped to help. Subsequently, R.A. and the driver of the vehicle got into the defendant's vehicle, and he brought them to the residence of a third party. At that residence, R.A. threw up a couple of times. The

7

defendant indicated there was an argument over the wrecked vehicle. He left and went straight home.

Lieutenant Todd Credeur testified that he interviewed the defendant some time after the interview conducted by Detective Lemaire. During that interview, the defendant gave the same details he had provided in his previous statement. The defendant later indicated that version of the events was not true. At that time, he told Lieutenant Credeur that he had sex with R.A. on a gravel road. The defendant stated that at one point, R.A. started screaming and also said, "Don't kill me." The screaming began after the defendant had penetrated R.A. He also stated that R.A. said, "What are you doing to me, why are you doing this to me?" The defendant also stated that R.A. asked him to stop, and he stopped right away. He later stated he stopped a little while later. Lieutenant Credeur testified that he asked the defendant if R.A. was too drunk to remember. At first the defendant told him yes then said, "Well, no, not really. She knew what was going on."

The defendant testified that he went to Wrangler's. While there, he met R.A. He further testified that he was intoxicated that night, but did not know how much alcohol R.A. had consumed.

That night, he danced with R.A. He also kissed R.A. while they danced and she laughed. He testified that later, R.A. and the defendant went outside to retrieve items from their vehicles. Once at the defendant's vehicle, the two made out and had sex, which was interrupted. The two then went back into the bar.

Shortly before leaving the bar, R.A. indicated she wanted to go to Taco Bell and invited the defendant to go. The defendant then followed Istre and R.A. Istre later drove her car into a ditch, and the defendant came upon the accident. The

8

defendant suggested that the car be left so Istre would not get a DWI. He then allowed Istre to use his cell phone to call a wrecker. The wrecker refused to assist, so the defendant drove Istre and R.A. to a residence. Once at the residence, R.A. threw up while both outside and inside the residence. R.A. said she needed to go home and Istre told the defendant to bring her.

The defendant testified that while he drove R.A. home, she put her hand on his leg and rubbed it and he in turn did the same to her. R.A. then touched his groin area, so he pulled over on a gravel road. The two then began to kiss and eventually had vaginal sex. R.A. also performed oral sex on the defendant. The defendant testified that he never used force or violence during the encounter. Further, R.A. never told him no.

The defendant testified that during the middle of having vaginal sex with R.A., she started hollering "Please don't kill me." The defendant further testified that he asked her what she was talking about and he told her, "I'm not trying to hurt you." The defendant indicated that R.A. never got out of the vehicle or tried to run away, and he never grabbed her and dragged her back to the vehicle.

The defendant further testified that he stopped having sex with R.A., and he did not rape her. The defendant testified that he was not wearing a condom and could not recall if he ejaculated. Testing revealed that DNA recovered from R.A. belonged to the defendant.

After the incident, the defendant then drove R.A. home. During that drive, R.A. never told him she would not call the police. The defendant testified that R.A. never passed out or fell asleep during the time he was with her. The defendant admitted that when he was first questioned by police he said he had sex with R.A. in

9

the parking lot of Wrangler's, but did not say he had sex with her on the gravel road. The defendant testified that he did not do so because he was scared he would lose his kids. The defendant stated that he eventually told police what he testified to in court. Melody Sanchez testified that she had known the defendant for six years, and he was very truthful. Denise Credeur testified that the defendant was a very honest person.

In *State v. Henderson*, 41,657 (La.App. 2 Cir. 12/13/06), 945 So.2d 194, *writ denied*, 07-267 (La. 11/2/07), 966 So.2d 597, the victim accepted a ride from the defendant. The defendant drove to a dead-end street in a dark isolated area. The defendant stopped the car and told the victim to get out of the car. The victim refused to comply and made repeated requests for the defendant to take her home. The defendant attempted to physically remove the victim from the car, and she made an effort to brace herself by pressing her feet onto the floorboard of the car and pushing her body into the seat. The defendant eventually dragged the victim from the car by her arm and leg. He pushed her to the back of the vehicle where he penetrated her vagina with his penis. When the defendant stopped, he pushed the victim back to the passenger side of the vehicle.

The *Henderson* court found the evidence was sufficient to prove the victim was prevented from resisting the act by force under circumstances where she reasonably believed that such resistance would not prevent the rape. Thus, it upheld the defendant's conviction for forcible rape.

The defendant in the case at bar asserts the state failed to prove he used force against R.A. However, R.A.'s testimony revealed that the defendant grabbed her, put her in the driver's side of the vehicle, then penetrated her while she was bent over the driver's seat. This occurred in a remote area. The victim had nowhere to run and no

10

help was possible. During this sequence of events, R.A. told the defendant, "Please, no, just don't kill me out here." Furthermore, the jury's verdict indicates it chose to believe R.A.'s testimony over that of the defendant. After reviewing the evidence in a light most favorable to the prosecution, in accordance with *Jackson*, we find the state proved the elements of the offense charged beyond a reasonable doubt, that the defendant forcibly raped R.A.

For these reasons, we find this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NO. 3:**

In his third assignment of error, the defendant contends the state failed to prove he committed simple rape beyond a reasonable doubt.

Louisiana Revised Statutes 14:43 defines simple rape, in pertinent part, as:

> A. Simple rape is a rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of a victim because it is committed under any one or more of the following circumstances:
>
> (1) When the victim is incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent or any cause and the offender knew or should have known of the victim's incapacity.

In the present case, the state had to prove that the vaginal sexual intercourse with the victim was committed without her lawful consent because it was committed when she was incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent, i.e. alcohol or any other cause, that the offender knew or should have known of her incapacity, and that there was any sexual penetration, however slight.

> Simple rape emphasizes the incapacity of the victim to give lawful consent to sexual intercourse because of a stupor caused by an intoxicating agent or other cause. *State v. Chandler*, 41,063, p. 9 (La.App. 2 Cir. 9/8/06), 939 So.2d 574, 580, *writ denied*, 06-2554

11

(La.5/11/07), 955 So.2d 1277. In order to convict the defendant, the State has the burden of proving that the victim could not consent because she was in a "stupor" or abnormal condition of mind produced by intoxicating agent, i.e., alcohol. *See, State v. King*, 99-1279, p. 4 (La.App. 5 Cir. 4/25/00), 760 So.2d 540, 542, *writs denied*, 00-1498 (La.3/16/00), 787 So.2d 298 and 00-1452 (La.3/16/01), 787 So.2d 298; *State v. Porter*, 93-1106, p. 10 (La.7/5/94), 639 So.2d 1137, 1143. A defendant can be convicted of simple rape when the victim's capacity to resist was negated by an abnormal condition or state of mind caused by alcohol consumption. *State v. Porter*, 93-1106 at 10, 639 So.2d at 1143. In sexual offense cases, the victim's testimony alone can be sufficient to establish the elements of a sexual offense, even though the State does not introduce medical, scientific or physical evidence to prove the commission of the offense. *State v. Dixon*, 07-915, p. 11 (La.App. 5 Cir. 3/11/08), 982 So.2d 146, 153-54[.]

*State v. Starr*, 08-341, p. 12 (La.App. 5 Cir. 11/25/08), 2 So.3d 451, 459, *writ denied*, 08-2991 (La. 9/18/09), 17 So.3d 384.

John Paul Melancon testified that on the night in question, he drank with the defendant at the home of Kyle Credeur. The defendant then went to Melancon's residence, and the two continued to drink. J.H. and her sister, S.H., who was also Melancon's fiancé, were present.

Eventually, Melancon, the defendant, and J.H. played a drinking game known as Quarters, and S.H. went to bed. After playing for a while, J.H. laid down on the couch in the living room and went to sleep. Melancon and the defendant continued to drink and talk.

Melancon's son woke up at approximately 2:30 or 3:00 a.m. and Melancon went to tend to him. At that time, the defendant was in the living room watching television. Melancon laid down with his son and fell asleep. Melancon testified that S.H. later ran into the room screaming that the defendant attacked J.H. and was leaving. Melancon ran outside and attempted to stop the defendant, who drove away.

Melancon testified that the defendant had a panicked look on his face at that time. Melancon then went back inside his home, and J.H. was hysterical.

Melancon described the amount of alcohol J.H. consumed on the night in question as follows:

Q. So you are sure she had two or three?

A. Yeah. It wasn't much more than that because she had about two or three beers, you know; and she took a shot. And Toby had her took [sic] a shot. He made it. And he made it again a little shortly after that, and he said, "Take another shot." She said, "I can't right now." I was like, "I'll take them, you know." And he tried to do it again, and I was taking the shots.

J.H. drank between 8:00 and 10:30 p.m.

S.H. testified that J.H. was her sister. J.H. arrived at Melancon's home during the afternoon. The defendant came over around 9:00 or 9:30 p.m., and the group began to drink and talk. S.H. further testified that Melancon, the defendant, and J.H. began to play Quarters, and she went to bed.

J.H. ran into S.H.'s room at approximately 4:00 a.m. J.H. was hysterical and was screaming, "He wouldn't get off of me. He forced himself on me." J.H. then laid down in bed next to S.H., curled into a ball, and started screaming and crying. S.H. ran into the living room and saw the defendant walking out the door while attempting to put on his shoes. S.H. called out the defendant's name, and the defendant took off running. S.H. then woke Melancon, who ran after the defendant.

S.H. testified that J.H. did not have a boyfriend at the time of the incident and the two had split up a few days to a week before.

J.H. testified that she arrived at Melancon's home at 8:30 p.m. on the day in question. She later testified that she did not know exactly what time she got there. The defendant arrived at the home at approximately 9:00 or 9:30 p.m. J.H. testified

that she drank a beer before the defendant arrived and prior to S.H. going to bed, she had a couple more beers. Once S.H. went to bed, she, the defendant, and Melancon played Quarters. During that time, she had two or three shots. J.H. subsequently laid down on the couch and fell asleep. She drank over a four-hour period.

J.H. testified about the events that occurred next, as follows:

Q. After you went to sleep on the sofa, what happened next?

A. I heard moaning and kissing on my neck, and I was being held down by -- he was holding me down by my breasts and --

Q. Let me stop you for a second. So what's the first thing you felt?

A. Him kissing my neck.

Q. And then what after that?

A. I felt his penetration.

Q. Was he touching you anywhere other than the penetration?

. . . .

A. With his hands? Yes. He was grabbing my breasts.

Q. Okay. You are positive that you were penetrated?

A. Very positive.

J.H. then yelled S.H.'s name over and over, kept screaming "no," and pushed the defendant off her. She then picked up her pants and ran to S.H.'s room.

J.H. testified that her jeans and panties had been pulled down to her knees and she did not feel this while it occurred. J.H. went to S.H.'s room and laid down on the bed. She then buttoned and zipped her pants. On cross-examination, J.H. was questioned about her jeans as follows:

Q. You testified that you laid on her bed and zipped and buttoned your pants. Your pants, those were blue jeans?

14

A. Yes.

Q. They were button blue jeans?

A. Yes.

J.H. did not know if the defendant was wearing a condom or if he had ejaculated.

J.H. testified that she did have a boyfriend at the time of the incident and had sex with him on the date of the incident. Further, she was wearing the same clothing when she went to Melancon's house and had not showered before the incident involving the defendant.

The defendant testified that he and Melancon were at Kyle Credeur's home, and people were coaxing him to drink. The defendant eventually went to Melancon's home, where he spent time talking with S.H. At approximately 10:30 or 11:00 p.m., the defendant, Melancon, and J.H. began playing Quarters. The game lasted two to three hours. The defendant testified that he had approximately twenty shots and Melancon had more. Further, Melancon would make J.H. take shots. J.H. eventually quit the game and laid down. However, the defendant and Melancon continued to play. The defendant testified that J.H. had more than two or three shots. .

The defendant denied having sex with J.H. He further testified that he was drunk and did not know exactly what was going on, but he knew for a fact that he did not put his penis inside J.H. He asserted that he did not unbutton her pants. Further, the defendant indicated he had an amputation that would make it difficult for him to unbutton jeans.

15

The defendant further testified that he passed out on the floor and when he woke up, J.H. was walking toward her sister's room. As the defendant was leaving the residence, Melancon ran after him.

The defendant testified that on the night in question he was taking Morphine, MS Contin, Celebrex, and Rosarum. He was prescribed these medications for a back injury.

Carolyn Booker, an employee of the Acadiana Crime Lab and an expert in forensic DNA, testified that semen was found on J.H.'s jeans and panties and in the sexual assault kit. The semen was not that of the defendant. Booker testified that DNA would not be found if the offender wore a condom or did not ejaculate. Booker also testified that the defendant's DNA was not found in fingernail scrapings taken from J.H.

Booker performed a contact DNA test on the hip area of J.H.'s panties and did not find DNA that matched that of the defendant. Booker then testified that there was no guarantee of finding contact DNA from the person who pulled down J.H.'s pants and panties. Furthermore, J.H.'s jeans were not tested for contact DNA.

Booker testified that her office was never asked to analyze Melancon's DNA.

The defendant asserts that it is inconceivable and irrational that a drunk, highly medicated man with an amputated finger could unbutton J.H.'s button-fly jeans and pull those jeans and her panties down to her knees, then manage to penetrate her, all without waking her. Additionally, DNA evidence contradicted the state's contention that J.H. was raped. Further, there was no physical evidence presented.

When viewing the evidence in a light most favorable to the state, the record supports a finding that J.H. had consumed alcohol and was asleep when the defendant

16

began to touch her inappropriately. Because J.H. was sleeping, she could not consent to a sexual act, and the defendant was aware of her inability to consent. Further, J.H. testified that the defendant penetrated her. The jury's verdict indicates it chose to believe J.H.'s testimony over that of the defendant, and the victim's testimony alone is sufficient to establish the elements of a sexual offense, even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense. *See Schexnaider*, 852 So.2d at 457. Accordingly, we find that when the evidence is viewed in a light most favorable to the prosecution, in accordance with *Jackson*, the state proved beyond a reasonable doubt that the defendant committed the offense of simple rape. For these reasons, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 1:

In his first assignment of error, the defendant contends the trial court erred in denying his motion for new trial.

During trial, the defendant introduced as "Defendant's Exhibit 1" a report from the crime lab regarding the offense involving J.H. That report indicated that a reference DNA sample was taken from the defendant on October 23, 2003.

Out of the presence of the jury, the trial court informed the parties that the jurors wanted to know why the sample DNA was from 2003 when the events at issue happened in 2004 and 2006. The following exchange then occurred:

> THE COURT: . . . My response was, "I really don't know and since the" -- which was a lie -- "but since the person is not here any longer to answer that, all I can tell you is this relates to the incident in 2006; and that's all you need to know." And so one of the persons said, "Well, why is it all we need to know?" And I said, "Because the person is not here, and you can't ask questions." But I know it's from a previous incident. Now I know that because you told me that. You ask to put it in?

17

MR. ROBIDEAUX:  I do, but I still think it's improper to comment on the facts to a jury.

THE COURT:  Well, it is.  I didn't comment on them, and that's what I said.  I can't answer that question for you.  They asked me a question, "I read this date;" and I said, "I can't answer that question for you.  The person who is here from the criminal lab is not here, and this DNA evidence belongs to the 2006 case."  That's not commenting.  I didn't say anything more than that.

MR. BABIN:  Had they asked that, that would have been the response you would have given them?

THE COURT:  That's what I would have said if they asked that here.  What would you like me to say when they view that and then they have a question?  Or would you rather them not and then be -- I don't know what the answer of [sic] that is.

MR. BABIN:  There's a presumption here that that's prejudicial, and I don't know that that's a correct presumption.

THE COURT:  I don't either.

MR. ROBIDEAUX:  Just note my objection.  In fact, let me get the appropriate code article.

The defendant filed a motion for new trial.  Therein, the defendant asserted the trial court gave an opinion to the jury that defendant's Exhibit 1 related to the offense that occurred in 2006.  Thus, he was entitled to a new trial.  The trial court denied the motion.

> The denial of a motion for new trial is not subject to appellate review except for an error of law.  LSA-C.Cr.P. art. 858.  The ruling on a motion for a new trial is committed to the sound discretion of the trial judge and will be disturbed on appeal only when there is a clear showing of an abuse of that discretion.  *State v. McCorkle*, 97-966 (La.App. 5 Cir. 2/25/98), 708 So.2d 1212, 1218.  The merits of such a motion must be viewed with extreme caution in the interest of preserving the finality of judgments.  *State v. Pickrom*, 31,987 (La.App. 2 Cir. 5/5/99), 732 So.2d 800, 813.

*State v. Rodriguez*, 02-334, p. 40 (La.App. 5 Cir. 1/14/03), 839 So.2d 106, 133, *writ denied*, 03-482 (La. 5/30/03), 845 So.2d 1061, *cert. denied*, 540 U.S. 972, 124 S.Ct. 444 (2003).

La.Code Crim. Proc. art. 772 provides:

> The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted.

> This no-judge-comment rule is designed to safeguard the role of the jury as the sole judge of the facts on the issue of guilt or innocence. *State v. Hodgeson*, 305 So.2d 421, 430 (La.1974). Thus, if the effect of a comment is to permit a reasonable inference that it expresses or implies the judge's opinion as to the defendant's innocence or guilt, this constitutes a violation of the defendant's statutory right to no-comment and thus requires reversal. *State v. Green*, 231 La. 1058, 93 So.2d 657, 659 (1957). To constitute reversible error, however, the effect of the improper comment must be such as to have influenced the jury and contributed to the verdict. *State v. Johnson*, 438 So.2d 1091, 1102 (La.1983).

*State v. Camper*, 08-314, p. 9 (La.App. 4 Cir. 10/1/08), 996 So.2d 571, 578.

We need not determine whether the trial court's remarks were improper, as the defendant cannot prove the remarks influenced the jury and contributed to the verdict. The jury already knew the lab report was related to the offense that occurred in 2006, as the victim's name and the date of the offense were included in the lab report, and when the report was introduced into evidence, defense counsel stated the lab report was being introduced "in regards to the victim, [J.H.]" Accordingly, we find the trial court properly denied the defendant's motion for new trial.

For theses reasons, this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NO. 4:**

In his fourth assignment of error, the defendant contends the trial court erred in failing to articulate any factors whatsoever in formulating his sentences. We will not address the defendant's claims regarding his sentence for forcible rape, as that sentence must be vacated due to an error patent.

At the sentencing hearing, the trial court merely recited the sentencing range for simple rape and imposed the maximum sentence of twenty-five years.

The record reflects no compliance with Louisiana Code of Criminal Procedure Article 894.1, which requires the trial court to state for the record the considerations taken into account and the basis for imposition of the sentence.

Because the trial court failed to mention any basis for imposition of the sentence for simple rape, we cannot say the defendant's maximum sentence is supported by the record. *See State v. Spencer*, 00-1335, pp. 10-11 (La.App. 3 Cir. 2/28/01), 781 So.2d 780, 788. Accordingly, the sentence for simple rape is vacated, and the matter is remanded to the trial court for resentencing in compliance with article 894.1.

**CONCLUSION:**

The defendant's convictions are affirmed. His sentence for forcible rape is vacated, and the case remanded for imposition of a determinate sentence. Further, the defendant's sentence for simple rape is vacated, and the matter remanded for resentencing and compliance with La.Code Crim.P. art. 894.1.

**CONVICTIONS AFFIRMED; SENTENCES VACATED; REMANDED WITH INSTRUCTIONS.**

20