STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

21-680

STATE OF LOUISIANA

VERSUS

WILLIAM GRESHAM

**********

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. 2017-1716
HONORABLE JUDI F. ABRUSLEY, DISTRICT JUDGE

**********

CHARLES G. FITZGERALD
JUDGE

**********

Court composed of Elizabeth A. Pickett, Sharon Darville Wilson, and Charles G. Fitzgerald, Judges.

CONVICTION AFFIRMED;
SENTENCE VACATED AND REMANDED.

**Annette Roach**
**Louisiana Appellate Project**
**Post Office Box 1747**
**Lake Charles, Louisiana  70602-1747**
**(337) 436-2900**
**Counsel for Defendant/Appellant:**
    **William Gresham**


**Joseph Green**
**District Attorney**
**La'Ketha W. Holmes**
**Post Office Box 839**
**Oberlin, Louisiana  70655**
**(337) 639-2641**
**Counsel for Appellee:**
    **State of Louisiana**

**FITZGERALD, Judge.**

In this appeal, William Gresham (Defendant) appeals his conviction and sentence for sexual battery.

## PROCEDURAL HISTORY

On June 29, 2017, Defendant was charged by grand jury indictment with sexual battery of a female child under the age of thirteen years old in violation of La.R.S. 14:43.1(C)(2). As alleged in the indictment, the sexual battery occurred in Allen Parish in August 2016. The minor child, A.C., was four years old at that time.[1]

In response to the above charge, Defendant pled not guilty. A two-day jury trial was held in April 2021. At the close of evidence, the jury convicted Defendant of sexual battery. Prior to sentencing, Defendant moved for an acquittal or, alternatively, a new trial. After denying the motion, the trial court ultimately sentenced Defendant to forty years at hard labor. Credit was given for time served. Defendant appealed.

On appeal, Defendant asserts five assignments of error:

1) The trial court erred in denying the Motion for Judgment of Acquittal as the evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, was insufficient to prove beyond a reasonable doubt that [Defendant] committed a sexual battery upon A.C.

2) The trial court erred when it: 1) permitted the State to introduce evidence incorrectly deemed to be the first report of sexual activity; and, 2) denied the defense an opportunity to present evidence to counter a statement made by the interviewer that improperly bolstered the State's case.

3) The trial court imposed an indeterminate sentence.

---

[1] In accordance with La.R.S. 46:1844(W)(1)(a), the juvenile victim is identified by her initials.

4) The sentence imposed by the trial court violates the Eighth Amendment of the Constitution of the United States and La. Constit. Art. I, § 20, as it is nothing more than cruel and unusual punishment and, thus, excessive.

5) Counsel's representation of [Defendant] fell below that guaranteed by the Sixth Amendment.

## LAW AND ANALYSIS

### I. Errors Patent

In accordance with La.Code Crim.P. art. 920, we initially review the record on appeal for errors that are "discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." Here, there is one potential error that is patent on the face of the record: the indeterminate nature of Defendant's sentence. This potential error is addressed below in our discussion of Defendant's third assignment of error.

### II. First Assignment of Error

Defendant initially asserts that the trial court erred in denying his motion for acquittal because the evidence adduced at trial was insufficient to prove beyond a reasonable doubt that he committed sexual battery.

This is a sufficiency-of-the-evidence challenge. This type of challenge is reviewed on appeal under the standard given in *Jackson*, 443 U.S. 307. In *Jackson*, the Supreme Court explained that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original). "This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521. The appellate court's function is not to

2

assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

A reviewing court must afford great deference to a jury's decision to accept or reject the testimony. *State v. Allen*, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, *writs denied*, 02-2595 (La. 3/28/03), 840 So.2d 566, *and* 02-2997 (La. 6/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S.Ct. 1404 (2004). "Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." *Id*. at 626.

### A.  Summary of the Trial Testimony

The State called Janet McDaniel to the stand. Janet testified that she came to know A.C. because of the child's mother, Shawna Meyers, and Defendant. Shawna and Defendant resided together. Janet stated that A.C. began living with her in 2016 at Shawna's request. Janet is married to William McDaniel. A.C. has always referred to him as "Pawpaw."

Janet explained that she frequently brought A.C. to visit with Shawna. Janet remembered bringing the child to Shawna on the evening of Friday, August 12, 2016. The plan was for A.C. to spend the weekend with Shawna. Janet described Shawna and Defendant's home as a portable building with a little porch.

Janet recalled that on Saturday, August 13, 2016, she ran into A.C., Shawna, and Defendant at Walmart. Janet felt that A.C. was dressed in an unusual and different manner compared to how she usually dresses. Thirty minutes later, Janet received a call from Shawna to come pick up A.C.

Upon arriving at Shawna's home, Janet noticed that A.C. was wearing a different outfit. Janet thought this was odd. She also thought it was odd that A.C.

wanted to take a bath as soon as they made it home. Janet noted that A.C. was quiet that evening. Janet also noted that A.C. was walking funny and had some pain, and when asked what was wrong, A.C. only said she was hurt. But A.C. then made a statement that something happened, which caused Janet to panic when hearing this. Janet repeated what the child had told her: "Daddy touched my crotch." A.C. refers to Defendant as either Daddy or Will. "I said, what did you say[?] She said, Daddy touched my p--sy." After hearing this statement, Janet contacted the police.

On cross-examination, Janet clarified that she picked up A.C. on Saturday, August 13, 2016, and that the following afternoon was when A.C. told her what happened. Janet reiterated that A.C. never referred to her (Janet's) husband, William, as Will; A.C. only called him Pawpaw.

The State then called Detective Sheila Laird to the stand. Detective Laird testified that she works on criminal investigations, and that she had been assigned to this case on August 14, 2016. Detective Laird stated that she met with Janet McDaniel and Janet's daughter, Leann Hyatt, and a four-year-old child, A.C. Detective Laird spoke with Janet about the incident. According to the detective, Janet "allowed [A.C.] to go visit her mother, Shawna, and [Defendant], who is her mother's boyfriend, for the weekend. Janet said when she picked [A.C.] up on the Saturday, she said that [A.C.] was walking funny."

Janet also reported, according to the detective, that "[A.C.] said that William hurt her girly parts and it hurt her." Upon learning this information, Detective Laird immediately scheduled a sexual assault examination which was conducted that same evening. Following the sexual assault examination, Detective Laird coordinated the scheduling of a forensic interview of the child at the Child Advocacy Center (CAC). She explained that she observed this interview from a separate room. During the

interview, she recalled A.C. saying "that Will had touched her girly parts with a stick." Detective Laird also took a statement from Janet about the incident, wherein Janet informed the detective that A.C. was behaving in an unusual manner, and that A.C. had identified the perpetrator as "Will."

During this line of questioning, the State asked the detective whether there was another person named Will—other than Defendant—who would have been known to A.C. In response, Detective Laird said that Janet's husband is named William, and he would have been known to the child. But Detective Laird then explained that she was able to confirm during her investigation that "Will" referred to Defendant.

Detective Laird next discussed her interview of Defendant on September 21, 2016. According to the detective, Defendant was born on February 12, 1993. Thus, he was twenty-two years old at the time of his interview. During the interview, Detective Laird said Defendant did not admit to having any contact with the child or that anything had happened between he and the child. The detective testified that Defendant was cooperative and forthcoming during the interview.

Detective Laird also stated that she had interviewed the child's mother, Shawna, more than once. According to the detective, Shawna admitted that A.C. was left alone with Defendant. When Detective Laird was asked if the mother had left A.C. alone with Defendant on other occasions, the detective answered, "She [Shawna] had different statements. The first interview she stated that she had been outside to go to the restroom." When asked why Shawna went to the restroom outside, Detective Laird answered, "Initially it was a camper, then it was a small shed made into a small home." The detective explained that the shed "was one room. She had stated to me that there was no plumbing."

5

When asked about the child's location on August 12th, the detective responded, "She would have been in the camper. There was a camper and then there was a small home." Detective Laird testified that Defendant and Shawna had been living there for several months. The detective stated that during her investigation, she did not learn of anyone else who could have been a potential suspect in the case.

On cross-examination, Detective Laird acknowledged conflicting statements as to where the incident happened. "At the time it was reported, it was at the camper." Detective Laird also noted that she had been told this incident happened at Shawna and Defendant's home, specifically on the porch with Defendant.

In response to a question about A.C.'s interviews, Detective Laird said that she had observed the interviews, and that the child had mentioned multiple places where the incident might have happened. Detective Laird could not recall whether the child specifically stated that the incident happened in the house, but "I do recall that there are different locations." As the cross-examination continued, Detective Laird acknowledged that Shawna had said that A.C.'s private parts were hurting before A.C. left the home. The detective also confirmed that the mother did not have running water, leaving the family to use the restroom outside. Detective Laird testified that this was not hygienic.

The State next called Faith Benton to testify. Benton stated that she was employed by the CAC. She was certified as a child forensic interviewer. Benton noted that she interviewed A.C. on two occasions: August 15, 2016, and August 31, 2016. Benton said, "[D]uring the first interview, the child gave a minimal disclosure and she requested to leave the room three times, so we ended the interview to maintain being child friendly. When she was a little more ready to talk, she came back for a second interview."

6

Benton then testified that both of A.C.'s interviews were consistent. Benton explained that she was able to obtain a drawing from the child, that the child identified the perpetrator, and that she (Benton) did not feel as though the child had been coached. Benton further explained that during this type of interview, it is normal for a child of A.C.'s age to give different answers.

On cross-examination, Benton recalled A.C. telling her that Defendant used a silver stick, that one stick was from the ground outside, and that the other was from a store. Benton also recalled A.C. saying that the incident happened at Walmart, and that he (Defendant) got the stick from the library.

Defense counsel then specifically asked about the second interview. "For at least the first thirty minutes, that child told you that nothing happened, correct?" Benton responded, "I don't recall a time, but yes." Benton recalled that A.C. said that nothing had happened more than once, and that she (A.C.) never had a bad touch. Benton also recalled A.C. saying that Defendant pulled her pants down and it was inside of her girl parts. When asked whether all this could have been a dream, Benton answered, "At her age, that wouldn't be a normal dream." Benton continued, "Unless something like that had already happened to her, that likely wouldn't be something that she would dream."

On re-direct, Benton explained that it was also typical of a child during an interview to state that nothing happened. When asked why a child might do this, Benton answered:

> There are lots of reasons, depending on how her mother reacted—she said that her mom was the first person she told, and often the first person that a child tell is going to have a very stressful reaction. Once they see that reaction, they then understand that it is something that was bad. So when they go to try to tell someone else, they don't want to.

Benton further explained that a child who has experienced trauma might not be able to recall the exact details of the traumatic event. But in both of A.C.'s interviews, the child clearly stated that Defendant was the person who had abused her.

The State next called Amanda Mouhot to the witness stand. Mouhot is a sexual assault nurse examiner. She examined A.C. on August 14, 2016. Mouhot noted that the incident happened on August 13, 2016, and that A.C. had taken at least two baths prior to the examination. Mouhot pointed out that when a patient takes a bath after being sexually assaulted, the chances of collecting evidence are reduced.

Nevertheless, Mouhot testified that the physical examination of A.C. revealed an injury to the posterior fourchette. She continued, "And the injury was in between the labia major and minor, as well as on the posterior fourchette, which is inside of the labia major." Mouhot noted redness and discoloration around the urethra meatus. She explained that A.C.'s injuries corroborated and supported possible sexual abuse. She further explained that A.C.'s injuries were visible to the eye, and that when she was manipulating A.C.'s skin, it hurt her. In Mouhot's opinion, it was unlikely that the abrasions on A.C.'s genitals would have been caused by the child scratching herself. "If a child were scratching herself, I would expect there to be scratching, more linear scratches along the outside of the labia. These injuries were more abrasions. And they occurred inside of the labia."

On cross-examination, Mouhot confirmed that A.C. did not give her any information about the case or what had happened. Mouhot elaborated, "The trauma that I noted corroborated and supported the story that I was given in the history." Mouhot could not definitively say that the injuries were from sexual abuse. She said

it was possible that the redness or irritation was caused by a lack of hygiene. But it was highly unlikely that the abrasions would have been caused by a lack of hygiene.

Dr. Scott Bergstedt is an OB-GYN who works on child sexual abuse cases. He was the State's next witness. Dr. Bergstedt examined A.C. on August 31, 2016. His examination revealed no trauma or abuse. However, Dr. Bergstedt explained that Mouhot's records indicated areas of abrasions as well as a tear around the vaginal opening. In his opinion, the abrasions and tear would have likely healed by the time he conducted his examination. He noted that in many sexual abuse cases, there are no physical findings because this area can heal very quickly.

On cross-examination, Dr. Bergstedt acknowledged that when he asked A.C. if anyone had touched her, she gave no response. According to the doctor, A.C. indicated that sometimes her urine felt hot. But that, in the doctor's opinion, could be attributable to a bladder infection. He explained that hygiene could be an issue that might affect the vaginal area, but the same is true of abuse. He then explained that children do not want to hurt themselves. So while they may rub or touch themselves, they do not typically tear themselves. Yet the doctor could neither confirm nor negate the allegations of sexual abuse.

On redirect, Dr. Bergstedt reiterated that in the areas where the abrasions and tear occurred, A.C. would not have scratched those areas herself. And when asked if there was any penetration, he answered as follows: "So, in definition [] classically people talk about penetration which is penetration into the vagina, no, it doesn't fit that criteria. But penetration ever so slight, it does fit that definition." In his opinion, it is possible for there to be a slight penetration which would not tear the hymen.

Philip Simmers, a DNA analyst, was the next witness called by the State. Simmers processed a labia swab and panties from A.C., but the DNA testing did not

9

show the presence of male DNA on those samples. As to A.C.'s shorts, Simmers testified that the shorts contained a mixture of DNA, including a very minute amount of male DNA, but he could not confirm that this was Defendant's DNA.

A.C. was then called by the State. A.C. was born on February 7, 2012, making her nine years old at the time of the trial. She testified that she knew the difference between telling the truth and telling a lie. When she was asked whether she remembered saying that someone hurt her, she said yes and that it was Defendant. She also remembered being interviewed, and that what she said then was the truth.

There were two CAC interviews, and a video recording of each interview was admitted into evidence. The first interview of A.C. took place on August 15, 2016. She was four years old at that time. During this interview, A.C. was given pictures to look at and asked questions to distinguish between the truth and a lie. She shook her head "yes" that something had happened to her, but she shrugged her shoulders and did not initially talk about what had happened. She said she lives with her mom, Shawna, and that she likes to color and watch TV. She also said that she lives with Will, and that "he's mean." According to A.C., Will had a bad dream and went to jail.

When A.C. was asked if she ever had a bad touch, she responded, "Not every time but sometimes." When asked who gave her the bad touch, she named "Will." A.C. said Will touched me "right here." As A.C. answered, she pointed to her genitals and called that area her "girl part." She then said that Will used a stick to touch her girl part and that the stick was a silver stick. She said she was at Walmart. "Nobody was there when he touched me." A.C. said that Will got the stick "from library and he kept it and touched me with it." She also said Will poked her with the stick and that this happened two times, but "I don't know about the other time." A.C.

10

stated that she sees Will when she goes to her mom's house. According to A.C., the first person she told was her mom.

The second interview took place on August 31, 2016. During this interview, A.C. stated that she lives with Janet because she cannot stay with her mother. A.C. referred to Janet as "Granny sitting in the room with toys." A.C. said she visits her mom at Walmart. "Mom doesn't come here. She can't come here because Pawpaw said she can't." A.C. mentioned that she had been to the doctor and had her bottom checked. She said that nothing happened to her bottom, and "they just had to look at it. To see if it was red." She said nothing made her bottom red, and that "it turned red in the rain." She then said that she never had a bad touch, and that nothing happened at her mom's house.

As to who was with her at her mother's house, A.C. answered, "Just me and momma. Will was at work." A.C. said, "Will is dad because real dad is in jail. Will just got out of jail." She also said Will was her daddy a long time ago. She said they colored and played ball and that she liked to do everything with Will. She stated that Will touched her a little with the stick on her girly parts "but it didn't hurt." Her girly parts are "[d]own where your legs at under your belly, way down."

When asked about what Will did with the stick, A.C. responded, "He picked it up. He did it in a dream." After a few more exchanges, she said, "He dreamed about touching me in my girly parts, and he was in a dream when he touched girly parts. Boys can't touch girls right there. Not little girls." She then said that nobody else had touched her girly parts, "just Will."

A.C. said she felt nothing when her girly parts were touched by the stick. She again said Will used a stick to touch her girly parts. She continued, "He touched me right there." As to her clothes, A.C. replied, "They was up then he pulled them

down." She said nothing happened after Will pulled her pants down and that she did nothing. While A.C. again stated that her mom was the first person to whom she reported the incident, she could not remember what she told her mom or what her mom said in response.

On cross-examination, A.C. said that she referred to Defendant as "Will" during the interviews, and that she only learned of his full name when she read his name. When asked about Janet's husband's name, A.C. said his name is William McDaniel. And when asked if she had any nicknames for Janet's husband, A.C. said, "I call him Pawpaw." She said that Pawpaw works all day, gets up to eat, and then he goes to bed. A.C. reiterated that she referred to her private parts as "my girly parts." She said at the time of the interviews, she did not know what a crotch was.

A.C. next explained that there was no bathroom at her mom's house. She said she went to the bathroom outside or next door at Defendant's brother's house. A.C. also said that when she went to her mom's house, she would sit out on the porch. When asked about the incident, A.C. said she was on the porch and that she tried to go next door with her mom to pick up some laundry. She said Will was inside but then came outside.

On re-direct, A.C. reiterated that she knew the difference between a good touch and a bad touch. She said she remembered who had given her a bad touch, and it was Will. A.C. was then asked, "[E]very time you were asked about who had touched you, what did you say?" She answered, "Will." The child testified that this was still true today.

Turning now to Defendant's case-in-chief. A.C.'s mother, Shawna, was the first witness called by the defense. Shawna testified that she was married to Defendant, and that A.C. is her daughter. Shawna said that on the weekend in

question, she had called Janet and asked her to drop off the child. She then explained that she was not sure if she trusts her previous police statements because she was on drugs at the time. But Shawna noted that she has two other children, and that neither one had ever made an allegation like this against Defendant.

Nevertheless, Shawna testified that they (she, A.C., and Defendant) all slept in the bed together. Shawna explained that in August 2016, they were living in a portable building and that she and Defendant never had a camper. Shawna stated that she would use the bathroom outside but took her daughter to Defendant's brother's trailer, which was located next door. Shawna said that on the Saturday night in question (August 13, 2016), her daughter tried to follow her to Defendant's brother's trailer but decided to go back home to play. Shawna said that Defendant was also at home. According to Shawna, she spent about five minutes getting the laundry. When she returned, she saw her daughter playing on the porch, and Defendant was sitting on the porch. Shawna stated that this was the only time her daughter had been left alone with Defendant over that weekend.

Shawna further explained that when she returned home with the laundry, A.C. did not look distressed—she wasn't crying—and Defendant did not look any different. Shawna said that no one had taught her daughter to ''use the word p--sy to refer to her vagina.'' Shawna said that her daughter would not know that word. Shawna testified she first learned of the incident when people showed up and informed her that her daughter had been molested. She was told that her daughter had been taken to the doctor, but she was not present for the doctor exam.

According to Shawna, at some point after learning of the incident, "I took my daughter to the bathroom to try and ask her who did it because I have never [had] the chance to talk to her privately about it." Shawna said, "Janet has tried to accuse

13

me of doing it. I'm sorry, I just don't like that lady, she seems to lie a lot." Janet is a liar "[b]ecause she has told me a bunch of lies. Like she had told me that the doctor said my daughter had nine rips and seven scars and that they had all this evidence on my husband. My family was torn apart over this." Shawna continued, "Like I have been accused of it. Janet has told me that my daughter has said that I put chocolate on her and licked it off before. Like everything I was fed was lies. And everything that was said I have read has came [sic] from Janet's mouth. I just don't like that lady. I'm sorry, I don't."

Shawna said she felt like Janet's husband was the pervert, and that perhaps he was the "Will" who touched her daughter. Shawna explained, "He has made perverted looks at my niece. He has made perverted comments towards me. And the lady that I bought my home from said that he raped her when she was 6 years old."

Shawna testified that she did not have any idea about the silver stick. Shawna stated she has had multiple discussions with Defendant about this matter, and that he has denied committing the act each time. Shawna emphasized that this event broke up her marriage. Shawna testified that she does not believe that Defendant abused A.C.

Shawna was then asked, "Was the child left alone with him long enough to possibly commit this act without you knowing?" Shawna replied, "No. I was sexually abuse[d] all my childhood. And I don't feel like five minutes is enough to do what I was told happened." Shawna also said the child did not say anything when she (Shawna) returned with the laundry except that "[s]he did tell me . . . that her crotch hurt. I asked her why and she said she don't know." Shawna said her daughter did not want to leave except for the fact that they were going to church.

Defense counsel then asked, "So, it wasn't until after the child went to Janet's home after leaving your home that she started to accuse Will?" Shawna said, "Right. I never heard her say it with my ears." Shawna said she thinks her daughter is brainwashed.

On cross-examination, Shawna acknowledged that she had previously been admitted to a mental hospital for depression. Shawna also acknowledged a prior drug problem, stating: "Anything that I could put in my body I did it." According to Shawna, she stopped doing drugs sometime in 2016 but had never been to a treatment facility. Shawna was then asked, "Earlier in your testimony you stated the word, crotch, when you referred to a vagina . . . . So is it possible that she would have also said the word crotch?" Shawna replied, "Yes."

Defendant was the last witness to testify. Defendant stated he is twenty-eight years old, divorced from Shawna, and has two children. Defendant testified that he did not commit this crime.

As to the weekend in question, Defendant explained that he and Shawna picked up A.C. at IHOP on Friday, August 12, 2016. Thereafter, they went back to their house which was a portable building. Defendant noted that the portable building (their home) was the reason that Shawna allowed A.C. to live with Janet. Defendant described the building as forty feet by eleven feet with air conditioning but no plumbing or insulation. Nevertheless, after returning home, they (Defendant, Shawna, and A.C.) spent most of the weekend on the porch. But they also colored, played outside, and built a doll house. Defendant testified that on Friday, August 12th, the three of them were together the whole time—if A.C. needed to go to the bathroom, her mother took her; and Shawna and A.C. slept in the bed, while Defendant slept on the floor.

Defendant then turned his attention to Saturday, August 13th. He testified that on that day, Shawna went to his brother's trailer to get the laundry while he and A.C. stayed back and sat on the porch and played. According to Shawna, Defendant was back in five minutes. And when she returned, Defendant and the child were still playing on the porch. Defendant said he did not hear the child mention anything about her private parts, and that he did not have a silver stick at his home.

Defendant testified that he had not been using drugs—he had been clean for three months prior to A.C.'s visit; that he did not change A.C.'s clothes; and that if A.C. needed to take a bath, her mother would have bathed her. Defendant said that he did not learn about the sexual battery accusation until a year later, and he voluntarily offered his DNA. Defendant said that he volunteered his DNA because he is not guilty. He told Detective Laird that he was scared "[b]ecause I am being accused of a serious accusation that I didn't do." Defendant testified that he was fully cooperative with the police.

Defendant admitted having an aggravated battery conviction but said that he was never convicted of a sex crime. He confirmed that A.C. called him Will or Daddy. Defendant testified that he would never hurt A.C. Defendant maintained his innocence and was emphatic that he did not commit this crime.

On cross-examination, the State asked how he remembered picking the child up from IHOP when in his statement to Detective Laird he said that he did not recall how they got the child. In response, Defendant explained it was possible that he learned that information because he was in court the last few days. Defendant was then asked about his previous convictions. He reiterated that he had only been convicted of one crime: aggravated battery. But when pressed, he admitted being convicted of other crimes: simple battery and threatening a public official.

On re-direct, Defendant explained that he was of the belief that he had not been convicted of simple battery since he served no time in jail. He also clarified that the simple-battery incident did not involve a child. Defendant then noted that every time he was asked to come in by the police, he did. Defendant again emphasized that he did not abuse A.C., and that he fully cooperated with the police because he is innocent.

## B.    Sufficiency of the Evidence

The offense of "sexual battery" is defined by La.R.S. 14:43.1, which states:

> A. Sexual battery is the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, directly or through clothing, or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim, directly or through clothing, when any of the following occur:
>
> . . . .
>
> (2) The victim has not yet attained fifteen years of age and is at least three years younger than the offender.

Thus, for this court to affirm Defendant's conviction, we must determine whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that Defendant intentionally touched A.C.'s anus or genitals using any instrumentality or any part of his (Defendant's) body, and that A.C. was under the age of fifteen years old when this touching occurred.

Defendant contends that the evidence was insufficient because of A.C.'s inconsistent statements, the lack of corroborating testimony, and the lack of physical evidence of a touching. However, "discrepancies in factual testimony which require a determination of the witnesses' credibility go to the weight of the evidence, not its

17

sufficiency." *State in the Interest of J.A.*, 15-641, p. 3 (La.App. 3 Cir. 12/2/15), 179 So.3d 959, 961, *writ denied*, 15-2317 (La. 3/4/16), 188 So.3d 1058.

As to the lack of corroborating evidence and physical evidence, this court in *State v. Pennywell*, 13-1376, pp. 12-13 (La.App. 3 Cir. 5/7/14), 139 So.3d 587, 595 (citations omitted), explained:

> The jurors were free to reject or accept, in whole, or in part, the testimony of the victim. Furthermore, the testimony of the victim alone can support a verdict of guilty of a sexual offense even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense.
>
> Although there were inconsistencies between T.W.'s trial testimony and her statements at the advocacy center, the jury chose to believe portions of T.W.'s testimony, and this court should not second guess those credibility determinations. The two verdicts of guilty of aggravated rape are supported by T.W.'s testimony that she was seven years old at the time of the offenses and that Defendant performed oral sex on her on two occasions. For the reasons asserted herein, Defendant's two convictions for aggravated rape are affirmed.

Furthermore, in *State v. Seaton*, 47,741, pp. 12-13 (La.App. 2 Cir. 4/10/13), 112 So.3d 1011, 1018-19, *writ denied*, 13-1056 (La. 11/15/13), 125 So.3d 1102 (internal citations omitted), the second circuit noted:

> In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. This is equally applicable to the testimony of victims of sexual assault. Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant.

The record here reflects that at the time of the offense (August 2016), A.C. was four years old and Defendant was at least twenty-two years old. At the April 2021 trial, A.C. testified that she remembered the CAC interviews and that what she had said then was the truth. A.C. identified Defendant as the person who touched her. A.C. confirmed that she referred to Janet's husband as "Pawpaw"; in contrast,

18

she referred to Defendant as "Will" or "Daddy." While it is true that there were several occasions during A.C.'s second interview when she said "nothing" happened, she also stated during both interviews that Defendant had touched her, and she described the location where she had been touched.

As the finder of fact, the jury was entitled to reject or accept this evidence and testimony, and after deliberating and weighing the evidence, the jury found Defendant guilty of sexual battery. While there may have been some inconsistencies in A.C.'s interview, the jury chose to believe her testimony that Defendant touched her, and this court will not second guess those credibility determinations.

Importantly, under *Pennywell* and *Seaton*, the testimony of the victim alone could have been sufficient to affirm Defendant's conviction of sexual battery. But the jury here did not rely solely on the testimony of A.C. Rather, the jury heard from numerous other witnesses and reviewed the exhibits introduced in evidence, all of which aided in its determination as to Defendant's guilt.

For example, the State provided expert medical testimony from Amanda Mouhot, the sexual assault nurse examiner. While Mouhot could not definitively say that sexual abuse occurred, she testified that it was highly unlikely that A.C.'s injuries (visible abrasions between her labia major and minor) would have been caused by the child scratching herself. Dr. Bergstedt was of the same opinion. Additionally, Faith Benton, the child forensic interviewer, explained that it was typical of children to say that nothing happened because of how adults react when they are told about sexual abuse.

Based on the foregoing, we conclude that a rational trier of fact could have found proof beyond a reasonable doubt that Defendant was guilty of the crime of sexual battery. Again, it was the jury's prerogative to assess the credibility of the

19

witnesses and to accept or reject their testimony. We will not second guess the jury's credibility determinations nor will we impinge on its role as factfinder. Accordingly, Defendant's conviction is affirmed.

**III.     Second Assignment of Error**

In this assignment, Defendant asserts that the trial court erred (1) by permitting the State to introduce evidence incorrectly deemed to be the "first report" of sexual abuse, and (2) by denying Defendant the opportunity to present countervailing evidence.

As to the first part of the assignment, Defendant argues that it was improper for the trial court to permit Janet to testify as to what she was told by A.C. because Janet was not the first person to whom A.C. reported the abuse. According to Defendant, A.C. first reported the abuse to her biological mother, Shawna. Thus, Janet's testimony in this respect should have been excluded as inadmissible hearsay. This is Defendant's argument. The State disagrees, contending that Janet's testimony was properly admitted as non-hearsay.

Turning now to the applicable law. Louisiana Code of Evidence Article 801(C) defines "hearsay" as a "statement, other than the one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." Louisiana Code of Evidence Article 802 (emphasis added) then provides that hearsay is inadmissible "*except* as otherwise provided by this Code or other legislation." Louisiana Code of Evidence Article 801(D), for instance, classifies as non-hearsay admissions and certain other statements that would otherwise fall within the hearsay definition. More particularly, subparagraph (D)(1)(d) of that article provides that a "statement is not hearsay if . . . [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the

statement, and the statement is . . . [c]onsistent with the declarant's testimony and is one of initial complaint of sexually assaultive behavior."

So did A.C. first report the abuse to Shawna? To answer this question, we first turn our attention to Shawna's trial testimony. During her direct examination, defense counsel asked Shawna, "So, it wasn't until after the child [A.C.] went to Janet's home after leaving your home that she started to accuse Will?" Shawna responded, "Right. I never heard her say it with my ears." By comparison, the evidence is unequivocal that A.C. reported the abuse to Janet one day after leaving Shawna's home.

Now to A.C.'s testimony. During A.C.'s first video interview, she said that the first person she told was her momma. A.C. explained that she told her momma, "The same thing Will did to me." During A.C.'s second interview, she again said that her mother was the first person whom she told. Yet A.C. could not remember what she had told her mother or what her mother had said in response.

After a thorough review of the record, we agree with the State that A.C.'s report to Janet constituted the initial complaint of sexually assaultive behavior for purposes of La.Code Evid. art. 801(D)(1)(d).

Before going further, we note that Defendant's above argument on appeal is different than his objection at trial. Defense counsel objected to Janet's testimony at trial on the basis that she was neither a member of law enforcement nor a blood relative. The trial court correctly overruled that objection because the relationship between the victim and the recipient of the initial complaint is of no moment under

21

La.Code Evid. art. 801(D)(1)(d).[2]   Nevertheless, the trial court was not presented with the issue of whether A.C.'s initial complaint was made to Janet or Shawna.

This brings us to Rule 1-3 of the Uniform Rules—Courts of Appeal, which provides: "The Courts of Appeal will review only issues which were submitted to the trial court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise."  In this instance, we applied the interest-of-justice exception because defense counsel's hearsay objection—both at trial and on appeal—focuses on the application of La.Code Evid. art. 801(D)(1)(d).  But in the end, Janet's testimony was properly admitted as non-hearsay under subsection (D)(1)(d).

Turning now to Defendant's argument that he was denied the opportunity to present countervailing evidence at trial.  Defendant specifically asserts that he should have been allowed to question A.C. regarding the possibility that she had been previously sexually assaulted.  In response, the State contends that the trial court properly excluded this line of questioning because Defendant did not file a pre-trial motion seeking permission to ask these questions as required by La.Code Evid. art. 412(C).  We agree with the State.

Louisiana Code of Evidence Article 412(C) states:

> C. Motion. (1) Before the person, accused of committing a crime that involves sexually assaultive behavior, human trafficking, or trafficking of children for sexual purposes, may offer under Subparagraph (A)(2) or (B)(2) of this Article evidence of specific instances of the victim's past sexual behavior, the accused shall make a written motion in camera to offer such evidence.  The motion shall be

---

[2] As clarified in the Revision Comments to Article 801, "It is only the initial complaint by the victim, *whether made to a family member, policeman, or other person*, that is defined as non-hearsay under this provision.  Subsequent complaints or reports about the same crime would not be admissible under it." La.Code Evid. art. 801(D)(1) cmt. (e) (emphasis added).

accompanied by a written statement of evidence setting forth the names and addresses of persons to be called as witnesses.[3]

---

[3] Louisiana Code of Evidence Article 412, in its entirety, is reproduced as follows:

A. (1) Opinion and reputation evidence; sexual assault cases. When an accused is charged with a crime involving sexually assaultive behavior, reputation or opinion evidence of the past sexual behavior of the victim is not admissible.

(2) Other evidence; exceptions. When an accused is charged with a crime involving sexually assaultive behavior, evidence of specific instances of the victim's past sexual behavior is also not admissible except for:

(a) Evidence of past sexual behavior with persons other than the accused, upon the issue of whether or not the accused was the source of semen or injury; provided that such evidence is limited to a period not to exceed seventy-two hours prior to the time of the offense, and further provided that the jury be instructed at the time and in its final charge regarding the limited purpose for which the evidence is admitted; or

(b) Evidence of past sexual behavior with the accused offered by the accused upon the issue of whether or not the victim consented to the sexually assaultive behavior.

B. (1) Opinion and reputation evidence; trafficking. When an accused is charged with a crime involving human trafficking or trafficking of children for sexual purposes, reputation or opinion evidence of the past sexual behavior of the victim is not admissible.

(2) Evidence of specific instances of the victim's past sexual behavior is not admissible unless the evidence is offered by the prosecution in a criminal case to prove a pattern of trafficking activity by the defendant.

C. Motion. (1) Before the person, accused of committing a crime that involves sexually assaultive behavior, human trafficking, or trafficking of children for sexual purposes, may offer under Subparagraph (A)(2) or (B)(2) of this Article evidence of specific instances of the victim's past sexual behavior, the accused shall make a written motion in camera to offer such evidence. The motion shall be accompanied by a written statement of evidence setting forth the names and addresses of persons to be called as witnesses.

(2) The motion and statement of evidence shall be served on the state which shall make a reasonable effort to notify the victim prior to the hearing.

D. Time for a motion. The motion shall be made within the time for filing pre-trial motions specified in Code of Criminal Procedure Article 521, except that the court shall allow the motion to be made at a later date, if the court determines that:

(1) The evidence is of past sexual behavior with the accused, and the accused establishes that the motion was not timely made because of an impossibility arising through no fault of his own; or

(2) The evidence is of past sexual behavior with someone other than the accused, and the accused establishes that the evidence or the issue to which it relates is newly discovered and could not have been obtained earlier through the exercise of due diligence.

The time for filing pre-trial motions is addressed in La.Code Crim.P. art. 521. Paragraph A of that article reads as follows: "Pretrial motions shall be made or filed within thirty days after receipt of initial discovery, unless a different time is provided by law or fixed by the court upon a showing of good cause why thirty days is inadequate."

A similar issue was presented to a different panel of this court in *State v. Loyden*, 04-1558 (La.App. 3 Cir. 4/6/05), 899 So.2d 166. There, defense counsel attempted to ask questions regarding previous acts of molestation. In affirming the trial court's ruling to exclude such questions, this court provided the following explanation:

E. Hearing. (1) If the court determines that the statement of evidence contains evidence described in Subparagraph (A)(2) or (B)(2), the court shall order a hearing which shall be closed to determine if such evidence is admissible. At such hearing the parties may call witnesses.

(2) The victim, if present, has the right to attend the hearing and may be accompanied by counsel.

(3) If the court determines on the basis of the hearing described in Subparagraph (E)(1) that the evidence which the accused seeks to offer is relevant and that the probative value of such evidence outweighs the danger of unfair prejudice, such evidence may be admissible in the trial to the extent an order made by the court specifies evidence which may be offered and areas with respect to which the victim may be examined or cross-examined. Introduction of such evidence shall be limited to that specified in the order.

(4) Any motion made under Subparagraph C and any statement of evidence, brief, record of a hearing, or like material made or used in connection with the motion shall be kept in a separate, sealed package as part of the record in the case. Nothing in this Article shall preclude the use of the testimony at such hearing in a subsequent prosecution for perjury or false swearing.

F. Past sexual behavior defined. For purposes of this Article, the term "past sexual behavior" means sexual behavior other than the sexual behavior with respect to which the offense of sexually assaultive behavior is alleged.

G. The rules of admissibility of evidence provided by this Article shall also apply to civil actions brought by the victim which are alleged to arise from sexually assaultive behavior, human trafficking, or trafficking of children for sexual purposes by the defendant, whether or not convicted of such crimes.

Our review of the record indicates that the defendant in the present case failed to comply with the pre-trial, written motion requirements of La.Code Evid. art. 412(C). While the defendant did file a pre-trial Motion to Suppress the testimony of A.B. and L.B., the motion only challenged the competency of the victims due to their age and did not meet the requirements of La.Code Evid. art. 412(C).

*Id*. at 176.

Likewise, in *State v. Blue*, 591 So.2d 1173 (La.App. 1 Cir. 1991), *writ granted in part on other grounds*, 591 So.2d 1172 (La.1992), defense counsel asked the victim's mother whether the victim had ever complained about being sexually molested by another person. The prosecution objected, and the trial court sustained the objection. In affirming the trial court's ruling, the first circuit noted as follows:

In his brief to this court, the defendant argues that evidence of the alleged molestation of the victim by Mr. Martinez "was offered to show that someone other than the defendant had molested her in the past, therefore, she was able to describe the act of molestation." The defendant specifically notes that such evidence was not offered to impeach the victim's general reputation for chastity. Nevertheless, the trial court correctly ruled that any other such molestation of the victim was irrelevant and inadmissible. In this case, the victim was not physically injured, and no semen or other such physical evidence was recovered. Furthermore, consent was not an issue in this case. Additionally, as also noted by the trial court, *the defense failed to comply with the pre-trial, written motion requirements of Louisiana Code of Evidence article 412 C and D.*

*State v. Blue*, 591 So.2d at 1177 (citations omitted; emphasis added).[4]

In the case before us, Defendant wanted to ask A.C. whether she had been previously sexually assaulted to demonstrate how A.C. might have obtained knowledge of things of a sexual nature. However, Defendant waived the right to

---

[4] The Louisiana Supreme Court in *State v. Blue*, 591 So.2d 1172 (La.1992), overturned the decision on different grounds, specifically because the record did not reflect adequate compliance with La.Code Crim.P. art. 894.1, nor did it provide a factual basis for imposition of a near maximum term of imprisonment.

pursue this line of questioning by failing to file a pre-trial motion as required by La.Code Evid. art. 412(C).

For the above reasons, Defendant's second assignment of error lacks merit.

## IV.  Third Assignment of Error

In this assignment, Defendant asserts that the trial court imposed an indeterminate sentence by sentencing him to forty years without specifying the number of years to be served without benefits.  When the trial court imposed the sentence, the court stated:

> I sentence you to serve 40 years at hard labor in the custody of the Louisiana Department of corrections.  You are giv[en] credit for time served pursuant to . . . Louisiana code of civil procedure article 880. . . . The sentence guidelines stating the sentence [s]hall be imprisonment, at hard labor, for not less than 25 years[,] no more than 99 years.  At least 25 years of the sentence imposed shall be served without probation, parole or suspension of sentence.

The State contends that the above sentence is not indeterminate.  According to the State, the trial court clarified that "at least 25 years of the sentence imposed shall be served without probation, parole, or suspension of sentence."

Now to the applicable law.  The sentencing provision at issue is La.R.S. 14:43.1(C)(2), which states:

> Whoever commits the crime of sexual battery on a victim under the age of thirteen years when the offender is seventeen years of age or older shall be punished by imprisonment at hard labor for not less than twenty-five years nor more than ninety-nine years.  At least twenty-five years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence.

In addition, La.Code Crim.P. art. 879 provides that "[i]f a defendant who has been convicted of an offense is sentenced to imprisonment, the court shall impose a determinate sentence."

Turning now to the jurisprudence. In *State v. Ducote*, 18-60, p. 6 (La.App. 3 Cir. 11/14/18), 260 So.3d 627, 631, *writ denied*, 18-2026 (La. 4/22/19), 268 So.3d 298, this court concluded that the sentence was indeterminate when the judge ordered "at least two years" to be served without the benefit of probation, parole, or suspension of sentence.

Similarly, in *State v. Fruge*, 09-1131 (La.App. 3 Cir. 4/7/10), 34 So.3d 422, *writ denied*, 10-1054 (La. 11/24/10), 50 So.3d 828, this court vacated the trial court's sentence which failed to specify the number of years that were to be served without benefits on a forcible rape conviction.

In sum, the trial court's failure to expressly state on the record the number of years that Defendant must serve without benefit of probation, parole, or suspension of sentence makes the sentence indeterminate. Defendant's sentence for sexual battery is therefore vacated.

Since Defendant's sentence is vacated, we need not consider Defendant's fourth and fifth assignments of error.

## DISPOSITION

For the above reasons, Defendant's conviction for sexual battery is affirmed. However, Defendant's sentence is vacated, and the case is remanded for resentencing.

**CONVICTION AFFIRMED;**
**SENTENCE VACATED AND REMANDED.**